# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01656-COA

**NORA RASCO KEASLER AND STEVE KEASLER**                     APPELLANTS

v.

**HALEY PALMER ROBERSON FOWLER AND ZEKE ASHTON ROBERSON**                     APPELLEES

DATE OF JUDGMENT:                 10/03/2019
TRIAL JUDGE:                 HON. C. MICHAEL MALSKI
COURT FROM WHICH APPEALED                 UNION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANTS:                 MATTHEW YARBROUGH HARRIS
ATTORNEY FOR APPELLEE:                 JOE M. DAVIS (FOR HALEY FOWLER)
NATURE OF THE CASE:                 CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED - 11/24/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., WESTBROOKS AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1.    A grandmother and step-grandfather petitioned for visitation rights of their grandchild. At a bench trial, the grandchild's mother moved to dismiss the case at the close of the grandparents' evidence.

¶2.    Following trial, the chancellor dismissed the step-grandfather's case for lack of standing and further found that the grandmother "failed to show that additional grandparent visitation would be in the best interest of [the grandchild]." As a result, the court granted the mother's motion to dismiss. Finding no error, we affirm.

### FACTS

¶3.     During their marriage, Haley Fowler and Zeke Roberson had one child together, A.F.[1] Roberson's mother, Nora Keasler, and stepfather, Steve, were both actively involved in raising and taking care of A.F. when needed.

¶4.     Fowler and Roberson later divorced. Following their separation, the parents initially shared joint physical and legal custody of their daughter. But a chancery court later modified this arrangement to award sole physical custody to Fowler. Roberson maintained joint legal custody and was allowed to see his daughter every other weekend, on alternating holidays, and during alternating weeks in the summer.

¶5.     The revised custody arrangement apparently compromised the time A.F. spent with her paternal grandparents. Prior to the custody modification, Keasler and Steve enjoyed various outings and holiday functions with their grandchild. But the new custody arrangement caused them to only see her a few hours each month.

¶6.     Grieving the substantial reduction in quality time, Keasler and Steve sued both Fowler and Roberson for visitation of A.F. Roberson later joined "in all respects with the request of [his parents] for Grandparent Visitation."

¶7.     A bench trial was held in chancery court. Keasler testified that she deserved visitation rights because she had been a "big part of [A.F.'s] life since birth" and spent a lot of time with her grandchild prior to Roberson's and Fowler's divorce. She also claimed that she sacrificed several weeks and months of her time supervising A.F. at her son's and Fowler's request. To support her testimony, she admitted a slew of pictures of her outings with A.F.

---

[1] We decline to use the full names of minor children to protect their identities.

and introduced an impressive range of text messages between her and Fowler, where Fowler asked her to keep the baby.

¶8.     Most of Keasler's reasons for requesting court-ordered visitation were based on her desire to maintain the close-knit relationship she shared with A.F. She testified that because her son's visitation extended to only four days per month, and he was not "willing to give up those days to let [her] have . . . time with A.F.[,]" Keasler's time with her granddaughter was limited to four hours per month. However, she admitted that her son was not completely prohibiting her visitation with A.F. She also testified that she basically lived next door to her son.

¶9.     Steve was the second and last person to testify. Aside from revealing that he was self-employed and traveled frequently, he essentially echoed his wife's sentiments. After Steve testified, Fowler moved to dismiss the case "based upon there not being any evidence of unreasonable denial [of visitation] by the son."

¶10.    The court reserved ruling on the motion for a later time. In its written judgment, the court first eliminated Steve from its analysis because, as a step-grandparent, he "lack[ed] standing . . . to request grandparent visitation."

¶11.    The court next confronted Keasler's failure to specify which subsection of the visitation rights statute she wished to proceed under. In light of this "critical omission," the court examined Keasler's eligibility to petition for visitation under multiple subsections of the statute, Mississippi Code Annotated section 93-16-3 (Rev. 2018). According to the chancellor, the claim failed under subsection (1) because there was "insufficient proof

3

surrounding the criteria for assessing the best interest of A.F." Alternatively, Keasler's petition failed under subsection (2) because she failed to show that she was "unreasonably denied visitation" by her son. Under both rationales, the chancellor declined to fully assess specific factors to determine whether visitation was in the child's best interest.

¶12. Based on his findings, the chancery court granted Fowler's motion to dismiss. Aggrieved, Keasler appealed.[2]

## STANDARD OF REVIEW

¶13. "In reviewing a trial court's grant or denial of a Rule 41(b) motion for involuntary dismissal, we apply the substantial evidence/manifest error standards." *Gulfport-Biloxi Reg'l Airport Auth. v. Montclair Travel Agency Inc.*, 937 So. 2d 1000, 1005 (¶13) (Miss. Ct. App. 2006). "A judge should grant a motion for involuntary dismissal if, after viewing the evidence *fairly*, rather than in the light most favorable to the plaintiff, the judge would find for the defendant." *Id*. at 1004 (¶13) (emphasis in original). "The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Id*. at 1004-05 (¶13).

## ANALYSIS

¶14. Grandparent visitation rights are purely creatures of statute under Mississippi Code Annotated section 93-16-3. *Settle v. Galloway*, 682 So. 2d 1032, 1035 (Miss. 1996). Subsections (1) and (2) of the statute are two avenues by which a grandparent may petition for visitation. Miss. Code Ann. § 93-16-3. Under subsection (1) "either parent of the child's

---

[2] Steve did not join in this appeal, so we do not review whether he lacked standing.

4

parent" may petition for visitation rights if the court awards custody to one of the child's parents. *Id.* Alternatively, subsection (2) is reserved for those grandparents who do not qualify to petition under subsection (1). *Id.* § 93-16-3(2)(b). We note at the outset that only subsection (1) applies to Keasler's appeal because the court awarded primary physical custody to one parent, Fowler. *Id.* § 93-16-3(1) ; *see also Solomon v. Robertson*, 980 So. 2d 319, 320, 322 (¶¶1, 6) (Miss. Ct. App. 2008) (grandparent's petition for visitation rights proceeded under subsection (1) where one parent was not awarded sole physical custody of his child).

¶15.    Keasler presents many concerns in her brief, but the dispositive issue in this case is whether the chancery court erred in declining to fully assess A.F.'s best interests under *Martin v. Coop*, 693 So. 2d 912 (Miss. 1997), *abrogated on other grounds by Smith v. Martin*, 222 So. 3d 255 (Miss. 2017). In *Martin*, our Supreme Court established ten factors courts must address to determine the amount of visitation a grandparent should receive. *Id.* at 916. Its successor, *Smith*, clarified that chancellors must also use these factors to determine "whether grandparent visitation is in a child's best interest in the first place." *Smith*, 222 So. 3d at 264 (¶18).

¶16.    When a *Martin* analysis is not performed in grandparent-visitation cases, we will reverse. *See T.T.W. v. C.C.*, 839 So. 2d 501, 505 (¶12) (Miss. 2003) (Where the paternal grandmother was denied visitation of her grandchild, the chancery court erred in failing to specifically address the *Martin* factors in its final judgment); *Townes v. Manyfield*, 883 So. 2d 93, 97 (¶29) (Miss. 2004) ("[T]he *Martin* factors are to be applied and discussed in every

5

case in which grandparent visitation is an issue").

¶17. However, an analysis of *Martin* is not required when a grandparent fails to satisfy the criteria set forth in section 93-16-3. *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶21) (Miss. Ct. App. 2019). In that case, a chancery court granted a directed verdict after a grandparent failed to establish that a "viable relationship" existed under subsection (2) of the statute. *Id*. at 928 (¶1). One of her chief arguments on appeal was that the chancery court failed to analyze the *Martin* factors. *Id*. at 932 (¶20).

¶18. This Court reviewed the grandparent's motion for directed verdict under the standard of review for involuntary dismissals. *Id*. at 929 (¶11). We ultimately rejected the grandparent's argument, holding that "grandparents seeking visitation rights must *first* satisfy the requirements of section 93-16-3 before the chancellor is required to address the best interest of the child." *Id.* at (¶21) (emphasis added). In other words, a chancellor is not obligated to conduct a *Martin* analysis unless the grandparent first meets the prima facie requirements set out in the statute. *Id*.

¶19. In accord with *Vermillion*, we find that Keasler failed to first satisfy the requirements of section 93-16-3. Specifically, she did not provide the court with evidence to show that visitation was in A.F.'s best interest. As a result, application of the *Martin* factors was not required. *See also Hillman v. Vance*, 910 So. 2d 43, 47 (¶11) (Miss. Ct. App. 2005) (The chancellor was not required to proceed to *Martin* analysis where grandparents failed to first qualify under 93-16-3(2)); *Smith*, 222 So. 3d at 259 (The chancellor considered *Martin* factors only after finding that the appellants qualified to petition under section 93-16-3);

6

*Aydelott v. Quartaro*, 124 So. 3d 97, 101 (¶11) (Miss. Ct. App. 2013) ("Only by the [grandparents'] establishment of a viable relationship and unreasonable denial of visitation could [they] reach the "polestar consideration" for statutory grandparent visitation—whether "visitation rights of the grandparent with the child would be in the best interests of the child").

¶20. Keasler insists the chancellor had plenty of evidence to conduct the analysis, but her argument is not supported by the transcript. For example, one factor inquires whether a grandparent is willing to accept "the parent's manner of child rearing." *Martin*, 639 So. 2d at 916. Another asks whether the grandparent has "undermin[ed]" the parent's general discipline of the child." *Id*. Keasler did not offer testimony to answer either of these questions at trial. Neither does her testimony offer a clear picture of her "moral fitness," or show the "amount of disruption that extensive visitation will have on the child's life." *Id*.

¶21. Because Keasler failed to "first satisfy the requirements of section 93-16-3" by omitting this proof, a full analysis of the *Martin* factors was not required. Because the chancery court did not commit manifest error in granting the involuntary dismissal, we affirm its judgment.

¶22. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR.**